**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
EASTERN DIVISION**

**SOUTHEAST ARKANSAS HOSPICE, INC.**                                    **PLAINTIFF**

**v.**                                    **Case No. 2:13-cv-00134-KGB**

**KATHLEEN SEBELIUS, SECRETARY,
UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES**                                    **DEFENDANT**

**<u>OPINION AND ORDER</u>**

Plaintiff Southeast Arkansas Hospice, Inc. ("SEARK") brings this action against Kathleen Sebelius, the Secretary of the United States Department of Health and Human Services ("HHS"), alleging   that the Secretary's regulation purportedly prohibiting SEARK from discharging hospice patients who exhaust their hospice benefits operates as a regulatory taking and that the provider agreement is an unconscionable contract of adhesion, requiring SEARK to continue to serve hospice patients even after their benefit period has ended while making no provision for payment to the hospice after the benefit period ends.  Pending before the Court is SEARK's application for a temporary restraining order or preliminary injunction to stay collection of all demands for repayment pending final adjudication (Dkt. No. 8).  The Court opted to consider SEARK's request as one for a preliminary injunction (Dkt. No. 10).  The Secretary responded to SEARK's motion (Dkt. No. 12), and SEARK filed a "trial brief" for the preliminary injunction hearing (Dkt. No. 13).  A preliminary injunction hearing was conducted on February 7, 2014.  For the following reasons, SEARK's request for a preliminary injunction is denied (Dkt. No. 8).

## I.      Background

SEARK operates hospice-care facilities in Pine Bluff, Arkansas, and Helena, Arkansas, and receives reimbursement for hospice care provided to Medicare beneficiaries pursuant to the hospice benefit included in Medicare Part A.  *See* 42 U.S.C. §§ 1395c, 1395f(a)(7).  A Medicare beneficiary may elect hospice care if at least two physicians certify that he or she is terminally ill, with a life expectancy of six months or less.  *See* 42 U.S.C. §§ 1395f(a)(7)(A), 1395x(dd)(3)(A).  Medicare generally pays hospice providers a fixed amount for each day the provider provides care to an eligible beneficiary.  42 U.S.C. § 1395f(i)(1); *see also* 42 C.F.R. § 418.302 (establishing rates).  When the hospice benefit was established in 1982, beneficiaries were generally limited to six months of hospice care.  *See* Tax Equity and Fiscal Responsibility Act of 1982,  § 122, Pub. L. 97-248, 96 Stat. 324, 356 (1982).  However, under an amendment included in the Balanced Budget Act of 1997, Pub.L. No. 105–33, § 4443(a), 111 Stat. 251, 423 (1997), if a beneficiary lives longer than six months, coverage may be extended for an unlimited number of 60-day periods.  *See* 42 U.S.C. § 1395d(d)(1).

To ensure that hospice care payments do not exceed the costs of treatment in a conventional setting, there is a "cap" on the total amount paid in reimbursements to hospice providers for all eligible patients in any given fiscal year.  42 U.S.C. § 1395f(i)(2)(A); H.R.Rep. No. 98–333, at 1 (1983), U.S. Code Cong. & Admin.  News 1983, p. 1043.  A provider's annual cap is calculated by multiplying a per-patient amount defined by statute and indexed for inflation, times the number of Medicare beneficiaries in the hospice program during that fiscal year.  42 U.S.C. § 1395f(i)(2)(A).  For purposes of this calculation, the number of beneficiaries in a hospice program in a fiscal year is adjusted to reflect the portion of care provided in a previous or subsequent reporting year or in another hospice. *Id*. § 1395f(i)(2)(C).

Although not at issue in this case, the Court notes that the regulation implementing the cap, 42 C.F.R. § 418.309(b), previously included a "streamlined methodology" that several courts, including one in this district, have found invalid for implying a calculus contrary to the legislative intent of 42 U.S.C. § 1395f(i)(2)(C).  *Southeast Arkansas Hospice, Inc. v. Sebelius*, 784 F. Supp. 2d 1102, 1109 (E.D. Ark. 2011) (collecting cases).[1]  In 2011, SEARK obtained a permanent injunction enjoining the Secretary from enforcing 42 C.F.R. § 418.309(b) against SEARK as to fiscal year 2009.  784 F. Supp. 2d at 1109.  The regulation was amended as a result of the litigation surrounding the streamlined methodology.  *See* 42 C.F.R. § 418.309(b) - (d) (eff. Oct. 1, 2011); Aggregate Cap Calculation Methodology, 76 Fed. Reg. 47308 (Aug. 4, 2011).  As amended, 42 C.F.R. § 418.309(c) now includes a "proportional" methodology consistent with the requirements of the governing statute, 42 U.S.C. § 1395f(i)(2)(C).

Hospice providers typically receive Medicare payments through a fiscal intermediary. The fiscal intermediary is responsible for calculating the hospice cap for the relevant accounting year.  When it is determined that a provider exceeded its aggregate cap for an accounting year, the fiscal intermediary issues a demand for the overage known as a Notice of Program Reimbursement ("NPR").  *See* 42 C.F.R. § 418.308(d).  Under 42 U.S.C. § 1395*oo*(a), a hospice provider  may challenge an NPR and seek a hearing before the Provider Reimbursement Review Board ("PRRB"), so long as the amount in controversy is at least $10,000.00 and the provider requests a hearing before the PRRB within 180 days after receipt of the NPR demand.  If the provider is dissatisfied with the PRRB's ruling, it may obtain judicial review by filing a civil

---

[1]  As opposed to the proportional allocation envisioned by the statute, the streamlined methodology was adopted to allocate care on an aggregate basis by allocating each beneficiary entirely to the cap year in which he or she would be likely to receive the preponderance of his or her care.  48 Fed. Reg. 56,008, 56,022 (Dec. 16, 1983); *see* CMS Ruling 1355-R (April 14, 2011),            *available            at*            http://www.cms.gov/Regulations-and-Guidance/Guidance/Rulings/downloads/cms1355r.pdf.

action within 60 days of the PRRB's final determination. *Id.* § 1395*oo*(f)(1). The PRRB has the authority to affirm, modify, or reverse a final determination of the fiscal intermediary, 42 U.S.C. § 1395*oo*(d), and the PRRB's decision constitutes a final agency ruling, unless it is appealed to the Secretary, *id.,* § 1395*oo*(f)(1). When the provider challenges the validity of a regulation itself, however, the PRRB lacks the authority to declare regulations invalid. *See Bethesda Hosp. Ass'n v. Bowen*, 485 U.S. 399, 406 (1988) ("Neither the fiscal intermediary nor the Board has the authority to declare regulations invalid."). "In this situation, once the PRRB has determined 'that it is without authority to decide the question' because the 'action of the fiscal intermediary . . . involves a question of law or regulations,' the provider may obtain 'expedited judicial review.'" *Lion Health Servs., Inc. v. Sebelius*, 635 F.3d 693, 697 (5th Cir. 2011) (quoting 42 U.S.C. § 1395*oo*(f)(1)). "Thus, the provider brings an action against the Secretary in federal district court, which the court tries pursuant to the standards of the Administrative Procedure Act." *Id.*; *see* 5 U.S.C. § 701 *et seq.*; 42 U.S.C. § 1395oo(f)(1); 42 C.F.R. § 405.1842.

SEARK voluntarily entered into a provider agreement with the Secretary in October 2004. SEARK agreed as the provider of services "to conform to the provisions of section 1866 of the Social Security Act and applicable provisions in 42 CFR" to receive payment under Title XVIII of the Social Security Act (Dkt. No. 8, at 83). SEARK now brings this instant action contending the provider agreement, together with the relevant regulations, violates the Takings Clause of the Fifth Amendment and constitutes an unconscionable contract of adhesion.[2] Specifically, SEARK takes issue with the prohibition on discharging patients who exceed the cap

---

[2] SEARK in its complaint also alleged causes of action for unjust enrichment, "deceptive and unfair business practice," and "subsidization of Medicare patients by SEARK" (Dkt. No. 1, at 8-10). However, SEARK indicated in a motion to amend its complaint that it now seeks to focus only on the Fifth Amendment and unconscionable contract claims (Dkt. No. 7, ¶ 2).

amount.   SEARK seeks a preliminary injunction to stay enforcement of seven demands for repayment.

Between January and May 2013, SEARK's fiscal intermediary, Palmetto GBA, sent five NPRs to SEARK's respective facilities.   SEARK's Pine Bluff location received NPRs demanding overpayment in the amount of $157,885.00 for the fiscal year ending October 31, 2010, and $155,640.00 for the fiscal year ending October 31, 2011.   SEARK's Helena facility received NPRs demanding overpayment in the amount of $177,166.00 for the fiscal year ending October 31, 2010, and $235,392.00 for the fiscal year ending October 31, 2011.   SEARK's Helena facility also received a revised NPR demanding $121,805.00 in overpayments for the fiscal year ending October 31, 2009.   Each NPR provided that all payments to SEARK would be withheld unless SEARK submitted within 15 days either the full amounts demanded or a request for an extended repayment schedule with an initial payment.   SEARK's Chief Executive Officer, Dr. Clifford Flowers, testified that he has submitted a repayment plan and initial payment for each of these NPRs.   SEARK has appealed these five NPRs to the PRRB.

The record indicates that, at each hearing request on its appeals and in a May 13, 2013, request for expedited judicial review ("EJR"), SEARK requested that cap determination be recalculated using the patient-by-patient proportional methodology described in 42 C.F.R. § 418.309(c) and, citing 42 C.F.R. § 418.26, asserted that its provider agreement with Medicare resulted in a regulatory taking, an unconscionable contract, and illegal subsidization.   In its EJR, SEARK also alleged its provider agreement requiring compliance with the Medicare regulations at issue is an unfair and deceptive business practice.   The PRRB issued its rulings on August 30, 2013.   The PRRB remanded the cap determinations to the Medicare Administrative Contractor (the "MAC") for recalculation under the requested methodology except for the NPR to the

Helena facility for fiscal year ended October 31, 2009, which had already been appealed and recalculated.  The PRRB concluded that it lacks jurisdiction over the challenge to the validity of 42 C.F.R. § 418.26.

SEARK received two additional NPRs on January 10, 2014, for the fiscal year ending October 31, 2012.  For fiscal year ending October 31, 2012, SEARK received one NPR for its Helena facility for $323,104.00, and one NPR for its Pine Bluff facility for $117,580.00.  These NPRs also threatened withholding of funds unless SEARK submitted within 15 days either the full amounts demanded or a request for an extended repayment schedule with an initial payment.  However, these NPRs added that withholding would be reduced from 100 percent to 30 percent while a request for an extended repayment schedule was under review.  These NPRs have not been appealed.  SEARK states it is in the process of appealing these NPRs to the PRRB.

SEARK seeks to stay any further collection activity on the seven NPRs demanding repayment, including any withholding of funds while the demands are outstanding.  SEARK has clarified that it also seeks to enjoin application of 42 C.F.R. § 418.26, which it believes prohibits discharge of patients who exceed their annual cap amount, and 42 C.F.R. § 418.309, the regulation implementing the methodology for calculating the cap amount.

According to the testimony of SEARK's Chief Executive Officer, Dr. Clifford Flowers, SEARK's primary source of income is Medicare hospice benefits for eligible patients.  Dr. Flowers is a pharmacist, not a medical doctor.  Dr. Flowers explained that only three of SEARK's 29 patients do not receive Medicare hospice benefits.  Dr. Flowers said that 11 of SEARK's patients at the Helena, Arkansas, facility have already exceeded their cap benefits for the year.

At the preliminary injunction hearing, Dr. Flowers testified that, when SEARK entered into the Medicare program, he understood SEARK would be paid for services rendered but did not have a clear understanding of what the hospice cap meant to SEARK in terms of payments for services rendered.  Dr. Flowers testified that SEARK first opened in 2002 (although the agreement is dated 2004), and SEARK received as a provider its first cap demand in 2006.

Dr. Flowers explained he interprets 42 C.F.R. § 418.26 to forbid discharging a patient simply because the patient has exceeded the cap.  SEARK has complied with his interpretation of the regulation and not discharged a patient because the patient exceeds the cap.  Dr. Flowers attributes several financial troubles to SEARK's compliance with § 418.26 and the hospice cap. Dr. Flowers, a pharmacist, stated he successfully operated a pharmacy for 28 years.  He formerly provided pharmacy services to the general public, as well as to the hospice patients.  He provided drugs and medical equipment for the patients' care.  He said that, since he was faced with repayment demands and withholdings, he was unable to pay his bills to his drug wholesaler.  His drug wholesaler eventually obtained a monetary judgment against him, which forced him as the proprietor of the pharmacy to go out of business and into bankruptcy.  Dr. Flowers also testified that he was unable to pay payroll taxes for a period of time because of the cap and repayment demands and, as a result, is now making payments to the Treasury Department to satisfy the obligation.

Dr. Flowers believes that he has an agreement and contract with the federal government to be paid for providing services to Medicare beneficiaries.  He views the agreement as a contract and considers them synonymous.  Dr. Flowers also believes the hospice cap makes the agreement unfair to him.  Dr. Flowers explained that Medicare continues to pay for services SEARK provides to a patient who has exceeded the annual cap amount.  He claims SEARK has

never billed Medicare for hospice services SEARK has not actually provided.  Although the cap amount is calculated on an aggregate basis, Dr. Flowers believes that the Secretary knows how many patients in his facility have already exhausted the cap benefit but will pay if billed for services to a patient who has exceeded the cap amount.  Dr. Flowers stated he bills for patient care knowing a patient has exhausted benefits because he would not otherwise be able to provide necessary care for the patient and keep the patient in the hospice program as required.

Dr. Flowers believes that the recoupment for overages is illegal and results in SEARK subsidizing hospice care for Medicare beneficiaries.  Dr. Flowers believes the cap itself should be invalidated.

Dr. Flowers testified that he is currently paying $25,000.00 per month in payment plans for overage repayments.  Dr. Flowers said he is currently facing the threat of a 30 percent withholding on his current funds pursuant to the January 2014 NPRs.  Dr. Flowers testified he will go out of business if he is forced to pay $25,000.00 in repayment while having 30 percent of his reimbursement funds withheld.  SEARK would be forced to attempt to transfer its 29 hospice patients to other providers.

Dr. Flowers explained that he has submitted a repayment plan for the January 2014 NPRs.  He believes it is unfair for him to pay repayments while his appeal is pending.  He also noted that, on his past NPRs, two of his requests for extended repayment plans of over 60 months have been denied and reduced to repayment plans of 36 months.  Dr. Flowers claims he was not aware of a CMS rule promulgated in September 2013 requiring the MAC to respond to written requests for extended payment reviews within 30 days.  He said the MAC has not always responded to him within 30 days prior to September 2013.

Dr. Flowers is concerned that, even if he goes out of business, the payment and repayment demands will follow him and inhibit him from making a living in other ways in the future.  He explained that he believes he cannot be a provider participating in other federal programs if he does not meet his repayment obligations here.  He believes the likely result will be that he will be prevented from practicing as a pharmacist because 90 percent of his former pharmacy business depended on Medicaid.

Dr. Flowers testified that he has at least one patient who has been in hospice care for two years.  He believes he is being forced to provide free care to the patient because he cannot discharge the patient for reaching his cap amount.  On cross examination, Dr. Flowers acknowledged that 42 C.F.R. § 418.26 permits a hospice to discharge a patient whose physical or emotional status has changed, such that the patient can be moved into a nursing home setting or discharged home from the hospice setting.  He said that his medical director has continued to certify this patient as terminally ill and that he and his medical director have not discussed whether other types of care such as curative care, not hospice care, may be more appropriate for this patient.

Dr. Flowers also agreed that his medical director is responsible for evaluating patients to determine whether they are considered terminally ill and have a life expectancy of six months or less.  Despite the issues SEARK has experienced with the hospice cap since 2006, Dr. Flowers admitted on cross examination that he has not sought any training on how to better evaluate incoming hospice patients to help stay under the cap.  He claims he does not know how one would seek training for such an assessment because no doctor can guarantee how long a person is going to live.

Dr. Flowers made clear that his requested relief on behalf of SEARK is either to be paid for all services SEARK provides, regardless of the cap, or to be granted the ability to discharge a patient for exhausting hospice benefits.

## II.    Analysis

In determining whether to grant preliminary injunctive relief, district courts in the Eighth Circuit must consider the following factors: "(1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (en banc).  A preliminary injunction is an extraordinary remedy and the burden of establishing the propriety of an injunction is on the movant.  *Roudachevski v. All-Am. Care Centers, Inc.*, 648 F.3d 701, 705 (8th Cir. 2011); *Watkins, Inc. v. Lewis,* 346 F.3d 841, 844 (8th Cir. 2003).  "At base, the question is whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the *status quo* until the merits are determined."  *Dataphase*, 640 F.2d at 113.   While no single factor is determinative in balancing the equities, *id.*, "the probability of success factor is the most significant."  *Home Instead, Inc. v. Florance*, 721 F.3d 494, 497 (8th Cir. 2013).   "To that end, 'the absence of a likelihood of success on the merits strongly suggests that preliminary injunctive relief should be denied.'" *Barrett v. Claycomb*, 705 F.3d 315, 320 (8th Cir. 2013) (quoting *CDI Energy Srvs., Inc. v. West River Pumps, Inc.,* 567 F.3d 398, 402 (8th Cir. 2009)).   Where a preliminary injunction is sought to enjoin the implementation of a duly enacted statute or regulation, the district court must make a threshold finding that a party is likely to prevail on the merits.  *See Planned Parenthood Minnesota, N.*

*Dakota, S. Dakota v. Rounds*, 530 F.3d 724, 732-33 (8th Cir. 2008).  Therefore, the Court begins with this factor.

Courts in the Eighth Circuit apply a heightened standard for determining success on the merits where the movant seeks to enjoin "duly enacted" legislation.  "Normally, a litigant seeking a preliminary injunction need only show a 'fair chance' of succeeding on the merits." *Edwards v. Beck*, 946 F. Supp. 2d 843, 847 (E.D. Ark. 2013).  However, "parties moving to preliminarily enjoin a statute or regulation must establish that they are 'likely to prevail on the merits,' because such promulgations came about by a 'presumptively reasoned democratic process[ ].'"  *Barrett*, 705 F.3d at 324 n.4 (quoting *Rounds*, 530 F.3d at 732).  The heightened "likely to prevail" standard requires greater than a 50 percent likelihood of prevailing on the merits.  *Edwards*, 946 F. Supp. 2d at 847 (citing *Rounds*, 530 F.3d at 732-33).

The Secretary argues as an initial matter that SEARK cannot show a likelihood of success on the merits because the Court lacks subject matter jurisdiction due to SEARK's failure to request the PRRB to grant EJR to determine the constitutionality of the 42 U.S.C. § 1395x(dd)(2)(D) or 42 C.F.R. § 418.100(d).  The Secretary essentially argues that SEARK failed to challenge the right or applicable regulations and statutes.  SEARK only challenged the constitutionality of the regulation it perceives prohibits discharge of patients who exhaust the benefits under the statutory cap, 42 C.F.R. § 418.26.  The Secretary points out that § 418.26 does not affirmatively prohibit discharge; it simply provides permissible reasons for discharge.  On the other hand, 42 C.F.R. § 418.100(d), which SEARK has not challenged, specifically provides, "A hospice may not discontinue or reduce care provided to a Medicare or Medicaid beneficiary because of the beneficiary's inability to pay for that care."  In addition, the Secretary argues that the prohibition on discharging patients for the inability to pay is a statutory mandate, as a

"hospice program" is by definition a public agency or private organization that "does not discontinue the hospice care it provides with respect to a patient because of the inability of the patient to pay for such care[.]"  42 U.S.C. § 1395x(dd)(2)(D).  However, SEARK did not challenge this statute.  The Secretary argues that SEARK has not received a final decision on the regulations and statute actually at issue in the challenge it seeks to have this Court resolve.  The Secretary also argues that even the five NPRs issued to SEARK that have been appealed have not been exhausted administratively because the PRRB remanded those NPRs for recalculation under the proportional methodology of 42 C.F.R. § 418.26(c).

"By granting 'the right to obtain judicial review of any final decision,'" 42 U.S.C. § 1395*oo*(f)(1) makes it clear that federal judicial review of Medicare reimbursement decisions is available only after the Secretary renders a final decision." *In Home Health, Inc. v. Shalala*, 272 F.3d 554, 559 (8th Cir. 2001); (citing *Heckler v. Ringer*, 466 U.S. 602, 605 (1984) ("Judicial review of claims arising under the Medicare Act is available only after the Secretary renders a 'final decision' on the claim")).  When the provider challenges the validity of a regulation itself, however, the PRRB lacks the authority to declare regulations invalid.  *See Bethesda Hosp. Ass'n*, 485 U.S. at 406.  "In this situation, once the PRRB has determined 'that it is without authority to decide the question' because the 'action of the fiscal intermediary . . . involves a question of law or regulations,' the provider may obtain 'expedited judicial review.'"  *Lion Health Servs., Inc.*, 635 F.3d at 697 (quoting 42 U.S.C. § 1395*oo*(f)(1)).

The Secretary presents her jurisdictional challenges as preliminary arguments; she states she intends to file a comprehensive motion to dismiss for lack of subject matter jurisdiction. Based on judicial economy and given that this matter is before the Court on a request for temporary restraining order or preliminary injunction, the Court will proceed to rule on the

request for injunctive relief and finds it unnecessary at this stage to reach a definitive answer on jurisdiction to do so.  Even assuming the Court has jurisdiction, SEARK is unlikely to succeed on the merits of its claims, regardless if this Court applies the "fair chance of succeeding on the merits" or the heightened "likely to prevail on the merits" standard.

SEARK primarily challenges the Secretary's regulation under the Takings Clause of the Fifth Amendment, which provides that private property shall not "be taken for public use, without just compensation."   U.S. Const. amend. V.   Courts have recognized so-called "regulatory takings" under the Takings Clause.  "The general rule at least is that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922).  For example, a regulatory taking occurs where public utilities are legally compelled to provide services to the public while limited to a charging a price "which is so 'unjust' as to be confiscatory."  *Duquesne Light Co. v. Barasch*, 488 U.S. 299, 307 (1989).  However, "[i]t is well established that government price regulation does not constitute a taking of property where the regulated group is not required to participate in the regulated industry."  *Whitney v. Heckler*, 780 F.2d 963, 972 (11th Cir. 1986) (*see Bowles v. Willingham,* 321 U.S. 503, 517-18 (1944) (rent controls do not constitute prohibited taking because statute did not require landlords to offer their apartments for rent)).

For example, in *Minnesota Association of Health Care Facilities, Inc. v. Minnesota Department of Public Welfare*, the Eighth Circuit held that a state statute limiting fees nursing homes participating in the state's Medicaid program may charge to non-Medicaid patients did not result in a taking because participation in the state's Medicaid program is voluntary.  742 F.2d 442, 446 (8th Cir. 1984), *cert denied* 469 U.S. 1215 (1985).  The court stated, "Minnesota nursing homes, unlike public utilities, have freedom to decide whether to remain in business and

thus subject themselves voluntarily to the limits imposed by Minnesota on the return they obtain from investment of their assets in nursing home operation." *Id*. "If appellants find that the reimbursement rates are insufficient, then they may either make their homes more efficient and economical or terminate their relationship with Medicaid and no longer accept Medicaid recipients as residents." *Id*. (internal quotations omitted). The court emphasized that the voluntary nature of participation in Medicaid "forecloses the possibility that the statute could result in an imposed taking of private property which would give rise to the constitutional right of just compensation, and thus it is unnecessary in this case to employ the adequacy standards applicable to state regulation of public utility rates." *Id*.

The Eight Circuit's rationale also applies to price controls imposed by virtue of participating in Medicare programs. *See Whitney*, 780 F.2d at 972 (holding that a temporary statutory freeze on fees non-participating physicians could charge Medicare patients did not constitute a taking because physicians were not required to treat Medicare patients; participation in Medicare is voluntary) (citing *Minnesota Ass'n of Health Care Facilities*, 742 at 446); *see also Garelick v. Sullivan*, 987 F.2d 913, 917 (2d Cir. 1993) (rejecting plaintiff anesthesiologists' challenge to statute limiting amount non-participating physicians may charge to Medicare beneficiaries because plaintiffs voluntarily chose to provide services to Medicare patients and noting that "[a]ll court decisions of which we are aware that have considered takings challenges by physicians to Medicare price regulations have rejected them in the recognition that participation in Medicare is voluntary."). Several courts specifically addressing the validity of 42 C.F.R. § 418.309(b)(1) rejected Fifth Amendment challenges to that regulation based on the voluntary nature of participation in the hospice program. *See Hospice of New Mexico, LLC v. Sebelius*, 691 F. Supp. 2d 1275, 1293 (D.N.M. 2010) *aff'd*, 435 F. App'x 749 (10th Cir. 2011);

*Zia Hospice, Inc. v. Sebelius*, 793 F. Supp. 2d 1289, 1299 (D.N.M. 2011); *Native Angels Home Care Agency, Inc. v. Sebelius*, 749 F. Supp. 2d 370, 378 & n.6 (E.D.N.C. 2010).

SEARK does not dispute that it voluntarily chose to become a hospice provider and participate in the hospice Medicare program.  Nonetheless, SEARK in its trial brief argues its participation in the hospice program at this point is not voluntary because it cannot discharge patients currently under its care and because it cannot go out of business at this juncture without facing "serious financial and maybe even criminal repercussions."  (Dkt. No. 13, ¶ 48).  At the hearing, Dr. Flowers testified SEARK cannot go out of business because this would prevent him from being able to participate in any other federal programs as a medical provider or pharmacist. The Court is not persuaded that these arguments establish legal compulsion.  The only compulsion to provide hospice services is imposed by virtue of SEARK's voluntary choice to provide services under the hospice program.  SEARK's arguments as to the potential financial burdens of closing its business fail because generally economic hardship does not amount to legal compulsion for purposes of the Takings Clause.  *See Minnesota Ass'n of Health Care Facilities*, 742 F.2d at 446 ("MAHCF contends that business realities prevent nursing homes from leaving the Medicaid program voluntarily.  Despite the strong financial inducement to participate in Medicaid, a nursing home's decision to do so is nonetheless voluntary."); *Garelick*, 987 F.2d at 917 (where state law required anesthesiologists on hospital staff to treat Medicare patients, anesthesiologists were not compelled to serve Medicare patients in that they could avoid this requirement by practicing in an outpatient setting, despite economic hardship of doing so). The Court finds that SEARK has failed to establish that it is likely to succeed on the merits of its Fifth Amendment challenge.

SEARK also contends that its provider agreement with the government constitutes an unconscionable contract because it requires SEARK to comply with the challenged regulations. SEARK also argues that it lacked any bargaining power in the transaction and, therefore, the contract is one of adhesion.  In response, the Secretary argues first that the provider agreement is a statutory entitlement and not a contract.

The Supreme Court has long "maintained that absent some clear indication that the legislature intends to bind itself contractually, the presumption is that 'a law is not intended to create private contractual or vested rights but merely declares a policy to be pursued until the legislature shall ordain otherwise.'"  *Nat'l R.R. Passenger Corp.*, 470 U.S. at 465-66 (1985) (quoting *Dodge v. Board of Education,* 302 U.S. 74, 79 (1937)).  "This well-established presumption is grounded in the elementary proposition that the principal function of a legislature is not to make contracts, but to make laws that establish the policy of the state."  *Id.*; *see also Koster v. City of Davenport, Iowa*, 183 F.3d 762, 766 (8th Cir. 1999).  The party asserting the creation of a contract must overcome this well-founded presumption.  *Nat'l R.R. Passenger Corp.*, 470 U.S. at 466.  The language and circumstances of the statute must evince a clear intent by the legislature to create contractual rights so as to bind the state.  *Koster*, 183 F.3d at 766.

The Secretary cites several cases in this area as to Medicare provider agreements, all of which support the Secretary's position that the agreement with SEARK is not a contract.  *See Mem'l Hosp. v. Heckler*, 706 F.2d 1130, 1136 (11th Cir. 1983) ("Upon joining the Medicare program, however, the hospitals received a statutory entitlement, not a contractual right."); *U.S. ex rel. Roberts v. Aging Care Home Health, Inc.*, 474 F. Supp. 2d 810, 820 (W.D. La. 2007) ("Medicare Provider Agreements create statutory, not contractual, rights.");  *Greater Dallas Home Care Alliance v. United States,* 10 F. Supp. 2d 638, 647 (N.D. Tex. 1998) ("[T]he right to

receive payments under the Medicare Act is a manifestation of Government policy and, as such, is a statutory rather than a contractual right."). SEARK has cited no legal authority on this issue. Indeed, SEARK makes no argument to overcome the presumption that the law at issue was not intended to create a contract.

Assuming SEARK could show contractual rights were created by the agreement, the Secretary contends that there is no evidence that any surprise or deceptive bargaining practices were present in the formation of the provider agreement. In support, the Secretary notes that the agreement is brief and the provision requiring compliance with the Secretary's regulations appears plainly and prominently.

The Court cannot say that SEARK is likely to succeed on the merits of its unconscionable contract claim. The weight of authority supports a finding that the provider agreement is not a contract. Even assuming the provider agreement is a contract, SEARK has not presented evidence to support a finding that the agreement is unconscionable. SEARK's substantive unconscionability argument falls back on its arguments under the Takings Clause of the Fifth Amendment. As to procedural unconscionability, SEARK simply presented testimony that Dr. Flowers, its Chief Executive Officer, did not appreciate the full implications of its agreement to abide by existing regulations.

The Court finds that SEARK has not made the requisite showing that it is likely to succeed on the merits, regardless if this Court applies the "fair chance of succeeding on the merits" or the heightened "likely to prevail on the merits" standard.

Even if this Court were to find in SEARK's favor on the other three *Dataphase* factors, those findings would not be sufficient for SEARK to prevail. As to the three other *Dataphase* factors, SEARK has presented testimony that it likely cannot survive as a going concern if the

demands for repayment are not enjoined.  As a general rule, economic loss does not constitute irreparable harm.  *See Sampson v. Murray*, 415 U.S. 61, 90 (1974).  However, the potential for irreparable harm is present "when the potential economic loss is so great as to threaten the existence of the moving party's business."  *Fort Smith Beepers, Inc. v. Mobilefone Serv., Inc.*, 533 F. Supp. 685, 688-89 (W.D. Ark. 1981) (quoting *Paschall v. Kansas City Star Co.*, 441 F.Supp. 349, 357 (W.D. Mo. 1977)); *see also Ryko Mfg. Corp. v. Delta Servs., Inc.*, 625 F. Supp. 1247, 1248 (S.D. Iowa 1985) ("Yet, irreparable injury has been characterized as loss of a movant's enterprise."); *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 932 (1975) (stating that threat of a substantial loss that would result in bankruptcy meets the standard for irreparable harm).  In addition, the threat of this harm to SEARK outweighs the injury that enjoining the demands for repayment would inflict on the Secretary or other interested parties.  Likewise, public interest appears to favor the preliminary injunction against the demands for repayment that SEARK claims threaten its ability to continue to provide hospice care to several patients in a rural area.  SEARK's showing on these factors cannot overcome its failure to make the requisite threshold showing of likelihood of success on the merits, however.  Therefore, SEARK's request for preliminary injunctive relief must be denied.

*       *       *

For these reasons, SEARK's application for a temporary restraining order or preliminary injunction, to stay collection of all demands for repayment, pending final adjudication is denied (Dkt. No. 8).

SO ORDERED this the 20th day of February, 2014.

_____
Kristine G. Baker
United States District Judge