IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
EASTERN DIVISION

**SOUTHEAST ARKANSAS HOSPICE, INC.**                                **PLAINTIFF**

v.                              Case No. 2:13-cv-00134-KGB

**SYLVIA BURWELL, SECRETARY,
UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES**                                       **DEFENDANT**

## OPINION AND ORDER

Plaintiff Southeast Arkansas Hospice, Inc. ("SEARK") brings this action against Sylvia Burwell, the Secretary of the United States Department of Health and Human Services ("HHS"), alleging that the Secretary's regulation purportedly prohibiting SEARK from discharging hospice patients who exhaust their hospice benefits operates as a regulatory taking and that the provider agreement is an unconscionable contract of adhesion, requiring SEARK to continue to serve hospice patients even after their benefit period has ended while making no provision for payment to the hospice after the benefit period ends.

Before the Court is SEARK's second application for a temporary restraining order to stay collection of demands for repayment pending final adjudication (Dkt. No. 27). The Secretary has responded (Dkt. No. 31), and a hearing was conducted on June 6, 2014. After the hearing, the Secretary filed a supplemental response to SEARK's motion (Dkt. No. 32). For the following reasons, SEARK's request for a temporary restraining order is denied (Dkt. No. 27).

**I.     Background**

This is SEARK's second request for preliminary injunctive relief. The factual and legal background of this case is set forth in more detail in the Court's February 20, 2014, Opinion and Order denying SEARK's previous request for a preliminary injunction (Dkt. No. 17).

SEARK operates hospice-care facilities in Helena, Arkansas, and Pine Bluff, Arkansas, and receives reimbursement for hospice care provided to Medicare beneficiaries pursuant to the hospice benefit included in Medicare Part A.  *See* 42 U.S.C. §§ 1395c, 1395f(a)(7).  A Medicare beneficiary may elect hospice care if at least two physicians certify that he or she is terminally ill, with a life expectancy of six months or less.  *See* 42 U.S.C. §§ 1395f(a)(7)(A), 1395x(dd)(3)(A).  Medicare generally pays hospice providers a fixed amount for each day the provider provides care to an eligible beneficiary.  42 U.S.C. § 1395f(i)(1); 42 C.F.R. § 418.302.  Hospice beneficiaries are generally limited to six months of hospice care, but if a beneficiary lives longer than six months, coverage may be extended for an unlimited number of 60-day periods.  *See* 42 U.S.C. § 1395d(d)(1).

To ensure that hospice care payments do not exceed the costs of treatment in a conventional setting, there is an aggregate "cap" on the total amount paid in reimbursements to hospice providers for all eligible patients in any given fiscal year.  42 U.S.C. § 1395f(i)(2)(A); H.R.Rep. No. 98–333, at 1 (1983), U.S. Code Cong. & Admin. News 1983, p. 1043.  As discussed in the Court's prior Opinion and Order, the regulation implementing the cap, 42 C.F.R. § 418.309, was amended in 2011 as a result of litigation in several district and circuit courts challenging the regulation's "streamlined methodology" for calculating the cap amount.

Hospice providers typically receive Medicare payments through a fiscal intermediary. The fiscal intermediary is responsible for calculating the hospice cap for the relevant accounting year.  When it is determined that a provider exceeded its aggregate cap for an accounting year, the fiscal intermediary issues a demand for the overage known as a Notice of Program Reimbursement ("NPR").  *See* 42 C.F.R. § 418.308(d).  Under 42 U.S.C. § 1395*oo*(a), a hospice provider  may challenge an NPR and seek a hearing before the Provider Reimbursement Review

Board ("PRRB").  If the provider is dissatisfied with the PRRB's ruling, it may obtain judicial review by filing a civil action within 60 days of the PRRB's final determination.  *Id.* § 1395*oo*(f)(1).

SEARK voluntarily entered into a provider agreement with the Secretary in October 2004.  SEARK agreed as the provider of services "to conform to the provisions of section 1866 of the Social Security Act and applicable provisions in 42 CFR" to receive payment under Title XVIII of the Social Security Act (Dkt. No. 8, at 83).  SEARK now brings this instant action contending the provider agreement, together with the relevant regulations, violates the Takings Clause of the Fifth Amendment and constitutes an unconscionable contract of adhesion.  Specifically, SEARK takes issue with the cap itself and the prohibition on discharging patients who exceed the cap amount.

SEARK previously sought a preliminary injunction to stay enforcement of seven demands for repayment at issue in SEARK's complaint and now its amended complaint. SEARK also sought to enjoin the application of 42 C.F.R. § 418.26, which it believes prohibits discharge of patients who exceed their annual cap amount, and 42 C.F.R. § 418.309, the regulation implementing the methodology for calculating the cap amount.  The Court conducted a preliminary injunction hearing on February 7, 2014, and subsequently denied SEARK's request for a preliminary injunction (Dkt. No. 17).  SEARK now requests a temporary restraining order based on what it contends are "new facts" pertaining to the last two of the seven NPRs (Dkt. No. 27, at 2).

By way of background, the first five NPRs at issue in this case were issued by SEARK's fiscal intermediary, Palmetto GBA, to SEARK's respective facilities between January and May 2013 for fiscal years ending October 31, 2009, October 31, 2010, and October 31, 2011.

SEARK's Chief Executive Officer, Dr. Clifford Flowers, testified at the first hearing that he had submitted a repayment plan and initial payment for each of these NPRs. SEARK has appealed these five NPRs to the PRRB. According to the record, as to each of these five NPRs, SEARK, in its requests for a hearing and expedited judicial review ("EJR"), requested a recalculation of the cap determination and, citing 42 C.F.R. § 418.26, asserted that its provider agreement with Medicare resulted in a regulatory taking, an unconscionable contract, and illegal subsidization. The PRRB issued its rulings on August 30, 2013, and remanded the cap determinations to the Medicare Administrative Contractor (the "MAC") for recalculation under the requested methodology, except for the NPR to the Helena facility for fiscal year ending October 31, 2009, which had already been appealed and recalculated. The PRRB concluded that it lacks jurisdiction over the challenge to the validity of 42 C.F.R. § 418.26.

SEARK received two additional NPRs on January 10, 2014, for the fiscal year ending October 31, 2012—one NPR for SEARK's Helena facility for $323,104.00, and one NPR for its Pine Bluff facility for $117,580.00. Unlike the first five NPRs, these January 2014 NPRs had not been appealed at the time of the February 7, 2014, preliminary injunction hearing, although SEARK stated it was in the process of appealing these NPRs to the PRRB.

On May 14, 2014, SEARK filed its second application for a temporary restraining order to allege new facts (Dkt. No. 27). Those new facts involve subsequent developments regarding the January 2014 NPRs. By letter dated April 15, 2014, Palmetto informed SEARK that CMS had approved SEARK's request for a 60-month repayment plan for the January 2014 NPR for its Helena facility originally totaling $323,104.00. However, on May 1, 2014, Palmetto sent to SEARK a letter notifying it that CMS denied SEARK's request for a 60-month repayment plan for the January 2014 NPR for its Pine Bluff facility originally totaling $117,580.00. The letter

4

stated that the request was denied due to "habitual Cap exceedance and other pertinent financial information" (Dkt. No. 27-2, at 1). Palmetto demanded full payment of the $111,459.32 in outstanding principle. The letter indicated that all payments to SEARK's facility would be suspended in 15 days if full payment was not received. By letter dated May 2, 2014, CMS informed SEARK that all payments were being withheld and applied against the overpayment for the outstanding $111,459.32 demanded in the January 2014 NPR for $117,580.00 (Dkt. No. 27-3). It appears from the record before the Court that this withholding applies only to SEARK's Pine Bluff facility. SEARK's two facilities are assigned separate Medicare provider numbers and receive separate NPRs addressed to each facility by its provider number.

SEARK maintains that, as to its payment plans in place currently, no payments have been missed or late. SEARK references in its filings a later telephone call and purported "mistake which prevented . . . entering the repayment plan on the $117,000.00 amount," (Dkt. No. 27, at 2). The Court notes SEARK did not develop a mistake theory in any of the proof offered. SEARK protests the Secretary's actions to withhold all payments for services rendered, especially during the pendency of this litigation. SEARK requests that the Court issue a temporary restraining order to stay the withholding of payments due and future payments and to stay further the collection of the repayment demands. It is not clear whether SEARK seeks to stay collection only as to the repayment demand for the January 2014 NPR for which the request for a payment plan was denied or as to all of the repayment demands.

According to the testimony of SEARK's Chief Executive Officer, Dr. Clifford Flowers, SEARK's primary source of income is Medicare hospice benefits for eligible patients. Dr. Flowers is a pharmacist, not a medical doctor. At the preliminary injunction hearing, Dr. Flowers testified that, when SEARK entered into the Medicare program, he understood SEARK

would be paid for services rendered but did not have a clear understanding of what the hospice cap meant to SEARK in terms of payments for services rendered. Dr. Flowers testified that SEARK first opened in 2002 (although the agreement is dated 2004), and SEARK received as a provider its first NPR in 2006. Dr. Flowers said at the June 6, 2014, hearing that he was not aware of the hospice cap until he received his first NPR in 2006.

At both hearings, Dr. Flowers explained that he interprets 42 C.F.R. § 418.26 to forbid discharging a patient simply because the patient has exceeded the cap. At the first hearing, Dr. Flower stated that he attributes much of SEARK's financial troubles to SEARK's compliance with § 418.26 and the hospice cap.

Dr. Flowers said at both hearings that he believes that he has an agreement and contract with the federal government to be paid for providing services to Medicare beneficiaries. He views the agreement as a contract and considers agreement and contract to be synonymous. Dr. Flowers also believes the hospice cap makes the agreement unfair to him. He explained that Medicare continues to pay for services SEARK provides to a patient who has exceeded the annual cap amount. Dr. Flowers believes that the recoupment for overages is illegal and results in SEARK subsidizing hospice care for Medicare beneficiaries. Dr. Flowers said at the February 7, 2014, hearing that he believes the cap itself should be invalidated. Dr. Flowers conceded at the second hearing that he, on behalf of SEARK, voluntarily entered into the agreement to abide by all applicable regulations in the Social Security Act, but he said the mere fact that he volunteered to participate in the hospice program does not make it fair that he is subject to what he describes as an unconscionable contract and illegal recoupments.

Dr. Flowers testified at the June 6, 2014, hearing that he was told he is being placed on 100 percent withholding because he had been over the cap too many times. Dr. Flowers said he

has not had more than 15 NPRs since the first NPR in 2006, but he said it is possible that he has received at least 10 NPRs.  He acknowledged that, prior to the recent denial of his request for a repayment plan for the January 2014 NPR for $117,580.00, HHS always granted his requests for repayment plans, although he said at the previous hearing that two past requests were modified to shorten the proposed plans from 60 to 36 months.

     Dr. Flowers does not believe that he could have prevented exceeding the cap because the regulations do not let him discharge patients who exceed the cap; he said he sees no way to avoid exceeding the cap without discharging patients.  At the first hearing, Dr. Flowers acknowledged that 42 C.F.R. § 418.26 permits a hospice to discharge a patient whose physical or emotional status has changed, such that the patient can be moved into a nursing home setting or discharged home from the hospice setting.  He said that his medical director has continued to certify this patient as terminally ill and that he and his medical director have not discussed whether other types of care such as curative care, not hospice care, may be more appropriate for this patient. Dr. Flowers also agreed at the first hearing that his medical director is responsible for evaluating patients to determine whether they are considered terminally ill and have a life expectancy of six months or less.  Despite the issues SEARK has experienced with the hospice cap since 2006, Dr. Flowers admitted on cross examination at the first hearing that he has not sought any training on how to better evaluate incoming hospice patients to help stay under the cap.  He claims he does not know how one would seek training for such an assessment because no doctor can guarantee how long a person is going to live.

     Dr. Flowers said at the second hearing that he had not attended any training since the first hearing.  He continues to assert his belief that no one could receive training for assessing patients and their end of life expectancy.  He believes that, if he attempted to assess patients himself, this

would put him in a position to contradict the doctors who refer patients to his facilities. Dr. Flowers said he accepts every patient a doctor refers to SEARK, although he acknowledged that his medical director must also certify the patient as a hospice patient.

Dr. Flowers testified at the first hearing that he was currently paying $25,000.00 per month in payment plans for overage repayments and was facing the threat of a 30 percent withholding on his current funds pursuant to the January 2014 NPRs. Dr. Flowers testified at the first hearing that he would go out of business if forced to pay $25,000.00 in repayment while having 30 percent of his reimbursement funds withheld. At the second hearing, Dr. Flowers testified that the Pine Bluff facility is in the process of closing in the face of the 100 percent withholding of payments. He said that he has fired all but two employees, a secretary and a nurse, who are being retained to close down the business. He said he is unsure of the status of his Helena facility going forward.

Dr. Flowers said SEARK is in the process of transferring its Pine Bluff patients and is no longer able to provide future care to those patients. Dr. Flowers said that not all patients at the Pine Bluff facility will be able to be transferred to other hospice facilities. He said the Area Agency on Aging is in the process of reviewing four patients for home health services. He said at least one other hospice provider is assessing his patients at the Pine Bluff facility. Dr. Flowers said some patients have been placed in another hospice, but only those patients who are not over the cap have been placed. On cross examination, Dr. Flowers denied that any of the patients who cannot find other hospice programs are being denied because the patients were determined not to meet the qualifications for receiving hospice care. He said one hospice provider in particular was worried about taking patients who had exceeded the cap.

Dr. Flowers stated that there is no option for care for his patients who cannot be placed in other hospice facilities. However, he admitted on cross examination that patients can go back to curative care in the hospital or nursing home setting.

At the June 6, 2014, hearing, SEARK introduced two letters from the PRRB dated May 12, 2014, with the PRRB's rulings on SEARK's requests for hearing and EJR as to the two January 2014 NPRs. The Secretary's counsel was not aware of these rulings prior to the hearing.

**II.     Analysis**

When determining whether to grant a motion for temporary restraining order or preliminary injunction, this Court considers: (1) the movant's likelihood of success on the merits; (2) the threat of irreparable harm to the movant; (3) the balance between the harm to the movant and the injury that granting an injunction would cause other interested parties; and (4) the public interest. *Heartland Acad. Cmty. Church v. Waddle*, 335 F.3d 684, 690 (8th Cir. 2003); *Dataphase Sys. Inc. v. CL Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981). SEARK bears the burden of establishing the propriety of preliminary injunctive relief. *Roudachevski v. All-Am. Care Centers, Inc.*, 648 F.3d 701, 705 (8th Cir. 2011); *Watkins, Inc. v. Lewis,* 346 F.3d 841, 844 (8th Cir. 2003). "At base, the question is whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the *status quo* until the merits are determined." *Dataphase*, 640 F.2d at 113. While no single factor is determinative in balancing the equities, *id*., "the probability of success factor is the most significant." *Home Instead, Inc. v. Florance*, 721 F.3d 494, 497 (8th Cir. 2013). "To that end, 'the absence of a likelihood of success on the merits strongly suggests that preliminary injunctive relief should be denied.'" *Barrett v. Claycomb*, 705 F.3d 315, 320 (8th Cir. 2013) (quoting *CDI Energy Srvs., Inc. v. West River Pumps, Inc.,* 567 F.3d 398, 402 (8th Cir. 2009)).

Where a preliminary injunction is sought to enjoin the implementation of a duly enacted statute or regulation, the district court must make a threshold finding that a party is likely to prevail on the merits. *See Planned Parenthood Minnesota, N. Dakota, S. Dakota v. Rounds*, 530 F.3d 724, 732-33 (8th Cir. 2008). Therefore, the Court begins with this factor.

Courts in the Eighth Circuit apply a heightened standard for determining success on the merits where the movant seeks to enjoin "duly enacted" legislation. "Normally, a litigant seeking a preliminary injunction need only show a 'fair chance' of succeeding on the merits." *Edwards v. Beck*, 946 F. Supp. 2d 843, 847 (E.D. Ark. 2013). However, "parties moving to preliminarily enjoin a statute or regulation must establish that they are 'likely to prevail on the merits,' because such promulgations came about by a 'presumptively reasoned democratic process[ ].'" *Barrett*, 705 F.3d at 324 n.4 (quoting *Rounds*, 530 F.3d at 732). The heightened "likely to prevail" standard requires greater than a 50 percent likelihood of prevailing on the merits. *Edwards*, 946 F. Supp. 2d at 847 (citing *Rounds*, 530 F.3d at 732-33).

The Secretary initially argued that SEARK cannot show a likelihood of success on the merits because the Court lacks subject matter jurisdiction due to SEARK's failure to exhaust its administrative remedies as to January 2014 NPRs. In view of SEARK's submitting the two May 12, 2014, letter rulings from the PRRB, the Secretary's counsel indicated it may be necessary to file a supplemental administrative record and a supplemental response to SEARK's current request for a temporary restraining order. The Secretary subsequently filed her supplemental response to SEARK's motion, and the Secretary has conceded that the January 2014 NPRs appear to be ripe for appeal.

Nonetheless, the Secretary argues in her supplemental response that the Court lacks subject matter jurisdiction due to SEARK's failure to request the PRRB to grant EJR to

10

determine the constitutionality of the 42 U.S.C. § 1395x(dd)(2)(D) or 42 C.F.R. § 418.100(d). The Secretary essentially argues that SEARK failed to challenge the right or applicable regulations and statutes and, therefore, failed to obtain a final decision on the regulations and statute actually at issue. The Secretary made these arguments in opposing SEARK's first request for injunctive relief, although she presented her jurisdictional challenges as preliminary arguments. The Secretary has since filed her motion to dismiss based in part on this and other jurisdictional challenges (Dkt. No. 29). That motion is not yet ripe.

Because this matter is before the Court on a request for temporary restraining order, and because the jurisdictional challenges are raised in the Secretary's unripe motion to dismiss with this Court not having heard yet SEARK's response to the challenges, the Court will proceed to rule on the request for injunctive relief before it without reaching a definitive answer on whether it has jurisdiction. Even assuming the Court has jurisdiction, SEARK is unlikely to succeed on the merits of its claims, regardless if this Court applies the "fair chance of succeeding on the merits" or the heightened "likely to prevail on the merits" standard.

SEARK primarily challenges the Secretary's regulations under the Takings Clause of the Fifth Amendment, which provides that private property shall not "be taken for public use, without just compensation." U.S. Const. amend. V. SEARK also alleges an unconscionable contract. The Court will address each claim in turn.

In denying SEARK's first request for injunctive relief, the Court found that SEARK failed to make the requisite showing of a likelihood of success on the merits on its Fifth Amendment claim. The Court's ruling focused on SEARK's voluntary participation in the hospice program, noting that "[i]t is well established that government price regulation does not constitute a taking of property where the regulated group is not required to participate in the

regulated industry." *Whitney v. Heckler*, 780 F.2d 963, 972 (11th Cir. 1986) (*see Bowles v. Willingham*, 321 U.S. 503, 517-18 (1944) (rent controls do not constitute prohibited taking because statute did not require landlords to offer their apartments for rent)).

This Court found instructive *Minnesota Association of Health Care Facilities, Inc. v. Minnesota Department of Public Welfare*, in which the Eighth Circuit held that a state statute limiting fees nursing homes participating in the state's Medicaid program may charge to non-Medicaid patients did not result in a taking because participation in the state's Medicaid program is voluntary. 742 F.2d 442, 446 (8th Cir. 1984). The Eighth Circuit emphasized that the voluntary nature of participation in Medicaid "forecloses the possibility that the statute could result in an imposed taking of private property which would give rise to the constitutional right of just compensation" and determined that it was unnecessary "to employ the adequacy standards applicable to state regulation of public utility rates." *Id.* This Court noted that the Eighth Circuit's rationale also applies to price controls imposed by virtue of participating in Medicare programs. *See Whitney*, 780 F.2d at 972 (holding that a temporary statutory freeze on fees non-participating physicians could charge Medicare patients did not constitute a taking because physicians were not required to treat Medicare patients; participation in Medicare is voluntary) (citing *Minnesota Ass'n of Health Care Facilities*, 742 F.2d at 446); *see also Garelick v. Sullivan*, 987 F.2d 913, 917 (2d Cir. 1993) (rejecting plaintiff anesthesiologists' challenge to statute limiting amount non-participating physicians may charge to Medicare beneficiaries because plaintiffs voluntarily chose to provide services to Medicare patients and noting that "[a]ll court decisions of which we are aware that have considered takings challenges by physicians to Medicare price regulations have rejected them in the recognition that participation in Medicare is voluntary.").

In addition, several courts specifically addressing the validity of the cap methodology in 42 C.F.R. § 418.309(b)(1) have rejected Fifth Amendment challenges to that regulation based on the voluntary nature of participation in the hospice program. *See Hospice of New Mexico, LLC v. Sebelius*, 691 F. Supp. 2d 1275, 1293 (D.N.M. 2010) *aff'd*, 435 F. App'x 749 (10th Cir. 2011); *Zia Hospice, Inc. v. Sebelius*, 793 F. Supp. 2d 1289, 1299 (D.N.M. 2011); *Native Angels Home Care Agency, Inc. v. Sebelius*, 749 F. Supp. 2d 370, 378 & n.6 (E.D.N.C. 2010).

SEARK does not dispute that it voluntarily chose to become a hospice provider and participate in the hospice Medicare program. Nonetheless, SEARK argued in support of its first request for injunctive relief that its participation in the hospice program at this point is not voluntary in view of the potential financial burdens of closing its business (Dkt. No. 13, ¶ 48). At the first hearing, Dr. Flowers testified SEARK cannot go out of business because this would prevent Dr. Flowers from being able to participate personally in any other federal programs as a medical provider or pharmacist. The Court was not persuaded that these arguments establish legal compulsion. The only compulsion to provide hospice services is imposed by virtue of SEARK's voluntary choice to provide services under the hospice program. SEARK's arguments as to the potential financial burdens of closing its business fail because generally economic hardship does not amount to legal compulsion for purposes of the Takings Clause. *See Minnesota Ass'n of Health Care Facilities*, 742 F.2d at 446 ("MAHCF contends that business realities prevent nursing homes from leaving the Medicaid program voluntarily. Despite the strong financial inducement to participate in Medicaid, a nursing home's decision to do so is nonetheless voluntary."); *Garelick*, 987 F.2d at 917 (where state law required anesthesiologists on hospital staff to treat Medicare patients, anesthesiologists were not compelled to serve Medicare patients in that they could avoid this requirement by practicing in an outpatient setting,

despite economic hardship of doing so). SEARK does not specifically address this issue in its current motion.

At the second hearing, Dr. Flowers suggested that the mere fact that his participation in the hospice program is voluntary does not make the challenged regulations fair. Dr. Flowers's arguments of unfairness do not establish compulsion. As stated above, the only compulsion to provide hospice services is imposed by virtue of SEARK's voluntary choice to provide services under the hospice program. The Court finds that SEARK has failed to establish that it is likely to succeed on the merits of its Fifth Amendment challenge.

The Secretary notes that, as part of its Fifth Amendment claim, SEARK briefly alleges in its amended complaint that 42 C.F.R. § 418.26 is arbitrary and capricious (Dkt. No. 26, ¶ 38) ("The regulation at issue, 42 C.F.R. § 418.26, is arbitrary and capricious and the demand for repayment to the regulation constitutes an unlawful Fifth Amendment taking."). The Secretary argues that this vague allegation fails to satisfy the two-step process for challenging agency construction of a statute established by *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984). SEARK has not addressed this issue in its pleadings or at the hearing. Indeed, at the recent hearing, SEARK only mentioned its Fifth Amendment claim and unconscionable contract claim. In other words, in this Court's view, based on the record before it, SEARK has made no attempt to advance a separate claim that 42 C.F.R. § 418.26 is an arbitrary and capricious regulation.

SEARK also alleges that its provider agreement with the government constitutes an unconscionable contract. SEARK's current motion makes no new arguments on this issue. SEARK previously argued that the provider agreement is an unconscionable contract because it requires SEARK to comply with the challenged regulations. SEARK also argued that it lacked

any bargaining power in the transaction and, therefore, the contract is one of adhesion. The Secretary argued that the provider agreement is a statutory entitlement and not a contract. The Secretary also contended that there is no evidence that any surprise or deceptive bargaining practices were present in the formation of the provider agreement. The Secretary repeats those arguments now. The Court previously ruled that SEARK failed to make a sufficient showing that it is likely to succeed on its unconscionable contract claim because the weight of authority suggests that the provider agreement is not a contract and because SEARK has not presented evidence to support a finding that the agreement is unconscionable. The Court stands by that ruling.

Absent "some clear indication that the legislature intends to bind itself contractually, the presumption is that a law is not intended to create private contractual or vested rights but merely declares a policy to be pursued until the legislature shall ordain otherwise." *Nat'l R.R. Passenger Corp. v. Atchison Topeka & Santa Fe Ry. Co.*, 470 U.S. 451, 465-66 (1985) (internal quotation marks omitted). The party asserting the creation of a contract must overcome this well-founded presumption. *Id.* at 466. The language and circumstances of the statute must evince a clear intent by the legislature to create contractual rights so as to bind the state. *Koster v. City of Davenport, Iowa*, 183 F.3d 762, 766 (8th Cir. 1999). The Secretary has cited several cases in this area as to Medicare provider agreements, all of which support the Secretary's position that the agreement with SEARK is not a contract. *See Mem'l Hosp. v. Heckler*, 706 F.2d 1130, 1136 (11th Cir. 1983) ("Upon joining the Medicare program, however, the hospitals received a statutory entitlement, not a contractual right."); *U.S. ex rel. Roberts v. Aging Care Home Health, Inc.*, 474 F. Supp. 2d 810, 820 (W.D. La. 2007) ("Medicare Provider Agreements create statutory, not contractual, rights."); *Greater Dallas Home Care Alliance v. United States,*

10 F. Supp. 2d 638, 647 (N.D. Tex. 1998) ("[T]he right to receive payments under the Medicare Act is a manifestation of Government policy and, as such, is a statutory rather than a contractual right."). SEARK has not cited any legal authority in support of its argument on this issue or made any argument to overcome the presumption that the law at issue was not intended to create a contract.

Even assuming SEARK could show contractual rights were created by the agreement, SEARK has not presented evidence to support a finding that the agreement is unconscionable. SEARK's substantive unconscionability argument falls back on its arguments under the Takings Clause of the Fifth Amendment. As to procedural unconscionability, at both hearings, SEARK simply presented testimony that Dr. Flowers, its Chief Executive Officer, did not appreciate the full implications of its agreement to abide by existing regulations.

For these reasons and those stated in the Court's prior Opinion and Order, the Court finds that SEARK has not made the requisite showing that it is likely to succeed on the merits, regardless if this Court applies the "fair chance of succeeding on the merits" or the heightened "likely to prevail on the merits" standard.

To the extent SEARK basis its second request for preliminary injunctive relief on an alleged due process violation separate from its Fifth Amendment claim, due process is not a basis on which SEARK seeks relief in its amended complaint (Dkt. No. 26). When raising due process in its motion, SEARK does not specify whether it contends substantive or procedural due process might be at issue, and these two theories are different. The elements of a substantive due process claim are that the defendant violated a fundamental constitutional right of the plaintiff and that the alleged violation shocks the contemporary conscience. *C.N. Willmar Public Schools, Indep. School Dist. No. 347*, 591 F.3d 624, 634 (8th Cir. 2010). This is a high standard.

*Id.* "[T[he theory of substantive due process is properly reserved for truly egregious and extraordinary cases." *Myers v. Scott Cnty*, 868 F.2d 1017, 1019 (8th Cir. 1989). If SEARK means to assert a substantive due process claim, it is not likely to succeed on the merits.

The elements of a procedural due process claim are that the plaintiff had a life, liberty, or property interest protected by the due process clause of the Fourteenth Amendment, that the plaintiff was deprived of that interest within the meaning of the due process clause, and that the state did not afford the plaintiff adequate procedural rights before depriving him of that interest. *Vaughn v. Ruoff*, 304 F.3d 793, 796 (8th Cir. 2002) (citing *Hahn v. Star Bank*, 190 F.3d 708, 716 (6th Cir. 1999)). If SEARK means to assert a procedural due process claim, the record to support such a claim has not been developed, and the Court determines that SEARK is not likely to succeed on the merits of such a claim.

The Court previously ruled that, even if this Court were to find in SEARK's favor on the other three *Dataphase* factors, those findings would not be sufficient for SEARK to prevail. That ruling remains. As to the three other *Dataphase* factors, SEARK previously presented testimony that it likely cannot survive as a going concern if the demands for repayment are not enjoined. At the second hearing, Dr. Flowers testified that, as a result of the withheld payments, he is in the process of closing the Pine Bluff facility, while he is unsure of the Helena facility's status. As a general rule, economic loss does not constitute irreparable harm. *See Sampson v. Murray*, 415 U.S. 61, 90 (1974). However, the potential for irreparable harm is present "when the potential economic loss is so great as to threaten the existence of the moving party's business." *Fort Smith Beepers, Inc. v. Mobilefone Serv., Inc.*, 533 F. Supp. 685, 688-89 (W.D. Ark. 1981) (quoting *Paschall v. Kansas City Star Co.*, 441 F.Supp. 349, 357 (W.D. Mo. 1977)); *see also Ryko Mfg. Corp. v. Delta Servs., Inc.*, 625 F. Supp. 1247, 1248 (S.D. Iowa 1985) ("Yet,

irreparable injury has been characterized as loss of a movant's enterprise."); *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 932 (1975) (stating that threat of a substantial loss that would result in bankruptcy meets the standard for irreparable harm). In addition, the threat of this harm to SEARK outweighs the injury that enjoining the demands for repayment would inflict on the Secretary or other interested parties. Likewise, public interest appears to favor the preliminary injunction against the demands for repayment that SEARK claims threaten its ability to continue to provide hospice care to several patients in a rural area. SEARK's showing on these factors cannot overcome its failure to make the requisite threshold showing of likelihood of success on the merits, however. Therefore, SEARK's request for a temporary restraining order must be denied.

\*    \*    \*

For these reasons, SEARK's second application for a temporary restraining order is denied (Dkt. No. 27).

SO ORDERED this the 11th day of June, 2014.

*/s/ Kristine G. Baker*
Kristine G. Baker
United States District Judge